**STATE of Missouri, Respondent,**

v.

**Kenneth EWING, Appellant.**

**No. 45579.**

Supreme Court of Missouri,

Division No. 1.

Feb. 11, 1957.

J. Bernie Lewis, Ava, T. A. Shockley, Waynesville, for appellant.

John M. Dalton, Atty. Gen., Grover C. Huston, Asst. Atty. Gen., for respondent.

COIL, Commissioner.

Appellant, Kenneth Ewing, referred to herein as defendant, was convicted of burglary in the second degree as charged and sentenced to two years in the state penitentiary. On this appeal he contends that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence.

In determining the sufficiency of the evidence to make a jury case, we con-

sider as true the evidence favorable to the state and the favorable inferences reasonably to be drawn therefrom, and reject countervailing evidence. State v. Swindell, 357 Mo. 1090, 1094, 212 S.W.2d 415, 417. So viewing the evidence in the instant case, a jury reasonably could have found the facts to be as they appear in the statement which follows.

On August 10 and 11, 1955, Sterling Wells owned and operated a garage, service station, and used-car business and, in that connection, owned a building situated on the south side of east-west U. S. Highway 66 some undisclosed distance east of Waynesville, Missouri. Highway 66 at that place is a 4-lane, divided highway. To the north of that highway, to which we shall refer as new 66, and for some distance east of the Wells building is a portion of old Highway 66 which parallels new 66 and which may be entered at various crossovers and which joins new 66 at a place approximately opposite the east end of the Wells building.

Mr. Wells and his partner in the used-car business, Mr. Stroup, had been in Springfield on August 10 attending a used-car auction. At approximately midnight they were traveling east on new 66 a short distance west of the Wells building intending to turn into the service station drive for the purpose of Wells' checking the day's receipts; the garage and service station having been theretofore closed. They followed an old Plymouth for a short distance which, when it reached the service station drive, gave the appearance that its driver intended to turn into that drive. Wells, because he wondered about the intention of the Plymouth's driver and because his own turn was somewhat blocked by the Plymouth, decided to and did pass the Plymouth after either Wells or Stroup had written the Plymouth license number on a piece of paper. Wells then drove eastwardly on 66 for about one-half mile to the third or fourth crossover (a place where one could get from the eastbound

traffic lane to the westbound lane) and then drove westwardly on 66 back to, and parked in the drive of, the service station. As they traveled westwardly neither Wells nor Stroup saw the Plymouth proceeding eastwardly on new 66.

The Wells building faced north, was about 60 feet long from east to west and 30 feet deep, and was divided into two rooms with an open door between them— the east room being occupied by the garage and the west room being a combination service station office and display room for parts, etc. There were two outside doors, both on the north side of the building; the easternmost opened into the garage and the other opened into the service station office. There were windows (an undisclosed number) across the rear of the building. As noted, the garage and service station were closed; the gasoline pump lights were off, but neon lights running along the gables and down the east end of the front of the building were on. A "night light" over the cash register located in the service station office was on.

Wells entered the garage door with a key, went into the service station office, opened the cash register, took therefrom about $100 and put back $20 with which to begin the next day's business, checked and adjusted the adding machine tape, closed the cash register, and left the building by the same door he had entered. That door was fitted with a Yale lock which automatically locked when the door was closed. Wells, however, checked the door after he closed it and found that it was securely locked. Wells then intended to take Stroup home, a short distance west. As he turned his car in the service station drive, its lights disclosed a Plymouth parked on old 66 some distance from the north edge of new 66 and in a secluded spot. Thereupon Wells, instead of driving west on 66, drove eastwardly to the first crossover, went north to old 66, and proceeded west thereon. He and his partner saw that the parked Plymouth was the same one

they had theretofore noted. They saw no one in it. Wells continued on, entered new 66, and took Stroup home. Wells then drove back eastwardly and into a driveway which led to his (Wells's) home located on a hill directly across and about 300–400 feet from the garage and service station.

Wells entered his house and, upon looking out the window, thought he saw a person in the service station drive at a point north of and about even with the west end of the building. He called the highway patrol at Rolla, continuing his watch of the building. He was not sure that he saw anyone thereafter until after the patrolmen arrived. Two highway patrolmen arrived at Wells's home within five minutes. He and the two patrolmen went immediately to the south edge of the Wells yard and, when they had been looking toward the building for about 30 seconds, they saw the defendant close to (not more than one foot away), and in the attitude of leaving or walking away from, the garage door. They saw defendant hesitate there a second, then walk at a "fast walk" eastwardly along the service station drive to some gasoline storage tanks located east of the east end of the building, again hesitate, then walk northwardly toward some used cars which were parked in the service station drive, again hesitate, and then walk northwardly partially across new 66. At that time Wells and the two patrolmen in the patrol car drove down the drive and onto old 66. By that time defendant had reached his Plymouth automobile and had started to drive away. Defendant's car was stopped and defendant questioned. Upon being asked what he was doing at the service station, he denied that he was there and then said that he had diarrhea and had gone over to the service station area to relieve himself. It was suggested that defendant show the officers the place where he had relieved himself, to which he answered that it was none of their business. (Later defendant told one of the patrolmen that it was near the stor-

age tanks.) Thereupon defendant was placed in the patrol car and driven to the service station. Wells and one of the patrolmen went to the garage door and found it open about four or six inches with no marks or other evidence of the door having been forced or pried open in any manner. Wells and one officer went through the garage into the service station office. They examined the cash register and found some of its keys had been pushed down and that a pair of pliers which ordinarily were located in the garage were wrapped in a shop towel and were lying near. Indentations on the top edge of the cash register drawer (not there when Wells had checked the register a few minutes before) fit the end of one of the pliers' handles. The $20 which had been left in the cash register was there and nothing had been taken from the premises.

There was evidence from which the jury could find that a check showed that the other door, i. e., the one leading into the service station office, was then closed; that all the back windows were then closed; that on the floor under one of the then closed back windows was the rod which served as a locking device. That was an iron rod about 2½ feet long which was supposed to fit on top of the lower sash and extend upwardly to the bottom of the molding of the top sash so that when it was securely in place the window could not be opened. No finger prints were found upon an inspection. The officers walked around the building and found no other person in the vicinity or anything else unusual. From the time they had begun to watch they had seen no other person in the vicinity of the station. The officers testified that, from the time they began watching, i. e., for the 30 seconds prior to the time they saw defendant at the garage door, if defendant had proceeded to that place from any place outside the service station they would have seen him approach and reach that point. They could not see into the station from their position in the Wells yard due to the bright neon lights on the outside of the

station. They examined the area around the gasoline tanks where defendant had said he had relieved himself but saw no evidence of such. Defendant at the time had on his person a substantial amount of money which may have been as much as $300. In defendant's automobile was a half-full bottle of drinking alcohol and some rocks, each the size of a soft ball. Defendant had been drinking and fumbled the papers when identifying himself, but could walk fairly straight. Neither the patrolmen nor Wells saw the defendant actually in the service station building. Wells estimated that not more than 15 minutes elapsed from the time he had last left the building and had returned with the patrolmen.

Defendant, who operated a barber shop near the gate of Fort Leonard Wood, said, in explanation, that he had been in Waynesville playing pool, had started eastwardly from Waynesville in his Plymouth with a Mr. Thompson driving. When they had driven an undisclosed distance an argument developed and he suggested that Thompson leave the car. Defendant continued alone eastwardly intending to go to his home which was on 66 an undisclosed distance west of the Wells building. When he arrived at the junction of State Highway 17 and U. S. Highway 66, however, he picked up a soldier and offered to take him to Rolla. He then drove eastwardly past the Wells service station and to Bennett's restaurant, which the state's evidence showed was at the fourth or fifth crossover east of the Wells station and which was beyond the point to which Wells and Stroup had theretofore driven. Defendant said that he let the soldier out there because defendant was sleepy and ill. Defendant then went north on a crossover and got onto old 66. When he reached the place on old 66 where his car was subsequently found, he had become increasingly sleepy and ill with intestinal flu and decided to park. He went to sleep for an indefinite time. When he awoke he wanted to relieve himself and left his car, went to the rear thereof but saw another automobile parked a short distance behind his car and headed in the same direction. He therefore decided to go across 66 to the service station area. He went to a place in the service station area west of the building, and there urinated. Immediately thereafter he walked eastwardly in front of the service station (maybe within three or four feet of the north wall) along its entire length, went to the storage tanks, there hesitated because he was again having stomach cramps, and then leisurely walked across the road and was apprehended before he reached his automobile.

When defendant's explanation is examined in the light of the state's evidence, which we take as true, it is apparent that it is unsatisfactory and not helpful to defendant on the question of the sufficiency of the state's circumstantial case. To illustrate: When defendant was questioned shortly after being apprehended as to the reason for leaving the secluded spot where his automobile was parked and going to the service station area for the purpose of relieving himself, he had no explanation; he first denied ever being at or near the service station, then said that he went over there for the purpose noted; he testified that he offered to show the officers where he had relieved himself; the officers testified that he had said it was none of their business; he said he had on gray trousers; the patrolmen positively testified that he had on khaki trousers; the patrolmen said he had gotten in his Plymouth and had started forward when he was stopped; he said he had not reached his car when he was stopped; he testified that he drove eastwardly with the soldier to the *fifth* crossover, but Wells testified that he had driven only to the third or fourth crossover and then had proceeded back westwardly and had not seen the Plymouth going eastwardly; when Wells and Stroup were returning to the service station on old 66 there was no car parked on old 66 other

than defendant's, and defendant testified that there was no car parked behind his when he returned from the service station.

Defendant contends that the circumstantial evidence adduced by the state, considered in conjunction with defendant's testimony, was insufficient, either to show that he entered the building or to show that he did so burglariously. We have no doubt, however, that the circumstances shown in evidence by the state were clearly sufficient to submit to a jury the question of whether defendant was in fact within the service station and whether he was there with the intent to commit a felony. The fact that Wells and the two patrolmen saw defendant at the garage door in an attitude of leaving the building, the fact that the patrolmen would have seen him had he reached that point from any place but from inside the building, together with all the other circumstances in evidence heretofore set forth, including defendant's unsatisfactory explanation of his presence there, constituted substantial probative evidence from which the jury reasonably could have found that defendant was in the building with the intent to steal money from the cash register.

The difficulty, however, with the state's case is that there was no evidence that defendant's entry into the building was burglarious in that the evidence failed to show the essential element of a "breaking." We have carefully examined the record before us in an attempt to discover some direct or circumstantial evidence of the fact, or to support an inference of the fact, that the west door and a back window were closed prior to the time of defendant's entry into the building.

▮▮ To sustain a charge of second degree burglary, it is essential to show, directly or circumstantially, that some force was used to effect entry. Slight force is sufficient. For example, the force necessary to raise or open an unlocked window or door is sufficient. Entry through an open door or window, however, does not constitute burglary. Thus, in the instant case, if the west door or the back window were left open and defendant entered through either, there was no burglary. State v. Allen, 344 Mo. 335, 337, 126 S.W. 2d 236 [1]; State v. Stewart, 329 Mo. 265, 270, 44 S.W.2d 100, 102 [3–6].

Were the facts that the garage door (east door) was closed and locked, that defendant departed through that door, and that that door was found ajar after defendant's departure, sufficient to permit a reasonable inference that defendant entered through the locked garage door? We think not, for these reasons. As noted, there was evidence that there were no marks of any kind indicating that the garage door had been forced or "jimmied" or pried open. True, the lock on that door may have been "picked" or the door opened with a duplicate key, without leaving any marks about the lock or door. But such an inference becomes unreasonable and conjectural when it must be drawn in the face of the owner's testimony to the effect that he did not know of the open or closed or locked or unlocked status of the back window when he left the building less than 15 minutes prior to defendant's entry; in face of the absence of any testimony as to the open or closed status of the west door, and in the face of Wells's testimony that at a time when he could clearly see the garage door as he looked from his bedroom window, he thought he saw someone at the place where cars were parked (north of the west end of the building) but thereafter, although he continued to watch, he did not see anyone go to the garage door.

In State v. Young, 345 Mo. 407, 411, 133 S.W.2d 404, 407 [10], this court discussed the sufficiency of the evidence there to support a finding that an entry had been made through a particular door. It was said: "Again, the information charged that the appellant entered the house through the front door. *There was * * * evidence that all the doors and windows had*

*been closed and fastened when the three members of the household retired for the night.* Two witnesses said the Yale lock on the front door was snapped on. The landlady testified she had not given anyone permission to enter the premises by pass key or otherwise except Miss Walton and her other roomer. The front door was found open a few minutes after the burglar fled. There was no testimony that either the door or the lock was damaged; and no direct evidence showing how entry had been effected. Nevertheless there undoubtedly was enough circumstantial evidence to show a burglarious entry at common law or on a charge of burglary in the second degree * * *." (Italics, present writer's.) It will be noted that there was present the testimony in that case, absent here, that all doors and windows were closed prior to defendant's entry.

In State v. Hutchinson, 111 Mo. 257, 20 S.W. 34, at page 35 it was said: "It is true there was no direct proof of the breaking or unlocking the door, but, as it was kept locked, the money was taken from the room, and defendant had been detected fitting a key in the lock, the jury might infer that he unlocked the door." In our case, defendant was not seen at the garage door prior to his entry and, as noted, he would have been seen if he had been there during the time Wells observed the outside of the building. See also State v. O'Brien, Mo.Sup., 249 S.W.2d 433, 434, and State v. Warford, 106 Mo. 55, 16 S.W. 886, as illustrative of the necessary circumstantial evidence to authorize a jury to infer a "breaking."

■ The evidence does sustain a finding that defendant opened (sufficient force to constitute a "breaking") the garage door in order to *leave* the building. Entry without a breaking, however, and later escape by breaking is "not burglary at common law nor under statutes declaratory thereof, * * *." 12 C.J.S., Burglary, § 8, p. 672. To constitute burglary in the second degree under the definition thereof contained in Section 560.070 RSMo 1949, V.A.M.S., requires a breaking and entering as did the common law. That such is the law in Missouri is indicated by the fact that Section 560.050 specifically defines when breaking out of a dwelling is burglary and Section 560.085 declares that breaking out of a dwelling shall not constitute burglary in any case not "herein particularly specified." The failure of any statute to define the crime of burglary as breaking out of any building other than a dwelling is clearly indicative of an intention that the general statute, Section 560.070, defining burglary in the second degree is declaratory of the common law and requires a "breaking" to effect entry.

■ For the reason that the state failed to adduce evidence, direct or circumstantial, of the closed status of all apertures prior to defendant's entry, the state failed to prove the essential element of a breaking. As was said in State v. Allen, supra, 126 S.W.2d 236 [2], "The state may be able at another trial to prove additional evidence tending to prove appellant guilty as charged; if not, the prosecution must fail." On the authority of the last-cited case, this case is reversed and remanded.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.